IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 3, 2015

STATE OF TENNESSEE v. DAETRUS PILATE

Appeal from the Criminal Court for Shelby County
No. 11-05220      Lee V. Coffee, Judge

No. W2015-00229-CCA-R3-CD  -  Filed January 29, 2016

Defendant, Daetrus Pilate, appeals his convictions for rape of a child, aggravated sexual battery, sexual battery by an authority figure, and incest and also appeals his effective sentence of forty-nine years.  Defendant argues that: (1) the trial court erred by permitting the State to present evidence that violated the rules of discovery; (2) the trial court erred by admitting a prior consistent statement of the victim; (3) the trial court erred by admitting evidence of Defendant's arrest and giving a jury instruction on flight; (4) cumulative error requires reversal of the convictions; (5) there is insufficient evidence to support his convictions; and (6) his sentence is excessive.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Gerald S. Green (on appeal) and Lauren Pasley (at trial), Memphis, Tennessee, for the appellant, Daetrus Pilate.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General, Senior Counsel; Amy P. Weirich, District Attorney General; and Katie Ratton and Carrie Shelton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This is Defendant's direct appeal of his Shelby County convictions for rape of a child, aggravated sexual battery, sexual battery by an authority figure, and incest.

## I. Facts

L.P., the victim and Defendant's daughter, testified that she had three siblings: an older brother, a younger brother, and a younger sister.[1] L.P. described her younger sister as a "special person," who has undergone extensive medical treatment for "short gut syndrome." At the beginning of her life, L.P.'s younger sister was "in and out of the hospital for probably about roughly five years." She now moves about in a wheelchair, and L.P. is very protective of her.

L.P. was nineteen years old at the time of the trial. When her younger sister was born, L.P. and her family lived in the Kingston Apartments in Memphis. She specifically remembered one occasion in her parents' bedroom when she engaged in oral sex with Defendant. Her mother was not home, and she was watching television with Defendant. L.P. remembered being naked with Defendant in a "sixty-nine" position. Defendant was on his back on top of the bed covers with his head against the headboard. L.P. was on top of Defendant, facing the television set and the bedroom door. Her mouth was on Defendant's penis, and his mouth was on her vagina.

L.P. was six years old when that incident occurred. During the incident, L.P.'s older brother, who would have been around nine or ten years old, opened the bedroom door. After looking into the bedroom, he shut the door without saying anything. Defendant said, "He's probably not going to remember it. He's just waking up. He's sleepy." L.P. left the bedroom and followed her brother into the kitchen, where he "said some words that actually hurt [her] feelings." The siblings "didn't talk to each other for a period of time," but eventually they "started back talking as normal . . . as if he forgot about it or he didn't see anything."

When L.P. saw her brother see her with her father, she felt "like the family just ended." L.P. was afraid that her family would be split up and that she would be placed in someone else's custody. Despite that incident, Defendant continued to abuse L.P. with oral sex. L.P. testified that she was "pretty sure there's probably other times, but that's the only time it actually stuck to me."

L.P.'s family moved to Bella Vista Apartments. She remembered going on rides with Defendant in his Thunderbird, and "every time [they] went to the store or

---

[1] To protect the identity of the minors, we shall refer to the victim as L.P. and her siblings as "the older brother," "the younger brother," and "the younger sister." Additionally, L.P.'s cousin who was also a minor will be referred to as "R.H." to protect her identity.

something, . . . he'[d] lean over to touch [her] or something." Whenever the two were alone, Defendant would touch her. L.P. also remembered times in their house when she would ask Defendant for permission to leave to go somewhere with others, and Defendant would touch her as he talked to her. When Defendant touched her, it was in "inappropriate ways, like he [was] feeling [her] breast or between [her] legs or something." Defendant's inappropriate touching happened constantly, "probably every day, moment to moment." These encounters began when L.P. was approximately eight or nine, while attending middle school, and continued until she was approximately fourteen.

When their family moved to an apartment at Woodbriar, L.P. remembered that Defendant began "trying to perform the act of intercourse, but it was like it didn't go in or something." L.P. was around nine or ten years old. Defendant attempted to penetrate L.P. approximately five to ten times. Defendant would quit when L.P. would say that it hurt or that she couldn't do it.

Defendant "didn't get full success until [the family moved] into Highland Pines." L.P. remembered that Defendant asked her, "You want to see the new house?" She answered affirmatively, and Defendant said, "It's got stairs and all that." Their new residence was a townhome. It did not have any furniture, and all of the floors, except the kitchen, were carpeted. Defendant showed L.P. around and then took her upstairs. He told her to pick out which bedroom she wanted, so L.P. picked the biggest room, which was next to her parents' room. Then, they "stopped on the floor, and [she] laid down right there, right there by the steps, and that's when he actually got full penetration." First, Defendant licked her vagina "just to where—to have it just slip in," and "after that, he got on top of [her] and put it in," his penis inside her vagina. L.P. "started to bleed like crazy," and she was scared. L.P. asked Defendant, "What's happening?" and he replied, "It's normal." She remembered that it "hurt a little bit," but it was a "nice painful." Defendant "took his time," so "after a while, it got . . . pleasurable." When Defendant finished, he gave L.P. a towel, and they drove to get her some pads before returning to their old residence to continue moving their belongings into the new home. L.P. estimated that she was ten years old and in the seventh grade at the time.

After that happened, Defendant was away from their home for several months, but when he returned he quickly resumed sexual activities with L.P. She "was so used to going to do it, it was just like a habit, but at the same time, [she] was like . . . , 'I'm tired of this,' like, 'I don't want this.'" As she got older, L.P. knew that what was happening was not right, and she wondered whether Defendant also knew that it was not right. However, they never talked about it.

-3-

L.P.'s family was evicted from Highland Pines, and they moved in with her aunt near Kirby. L.P. remembered one time when her aunt was at work that she had intercourse with Defendant "probably in the car."

The family then moved to a house on Heckle Avenue. When L.P. began high school, she developed a relationship with her first boyfriend. L.P. was excited and told her mother. When Defendant learned about the boyfriend, "he got mad" and "grounded" L.P. because she had "a hickey." L.P. felt that it was unfair for Defendant to be upset about her boyfriend because she was "old enough" and "responsible enough" to be in that kind of relationship. After L.P. went to her bedroom as punishment, Defendant later entered her room and attempted to initiate sex by talking to her and touching her breasts and crotch. L.P. became angry and yelled for her mother, who came to the room and began arguing with Defendant about whether it was appropriate for L.P. to have a boyfriend. L.P. did not tell her mother that Defendant had just touched her.

Soon thereafter, around November 2009, when L.P. was thirteen or fourteen, she wrote a note for her mother and left it on a mirror on top of her bookshelf in her room. L.P. then "ran" to tell her aunt "everything." Her cousin, R.H., was also present during this conversation, but her cousin already knew about what was going on. L.P. told her aunt that Defendant had done things to her, but she "didn't go into specifics." L.P.'s aunt went to tell L.P.'s mother about the allegations. After L.P.'s mother confronted Defendant, she "kicked him out" and comforted L.P. Her mother said, "[L.P.], I didn't know. You should have told me what [had] been happening." L.P. estimated that between the ages of ten and fourteen, Defendant had sexual intercourse with her more than twenty times.

After moving out of the home, Defendant began calling L.P., but when she heard it was his voice, she blocked his number. Defendant then began calling from a blocked number, but L.P. would not answer calls from blocked numbers. Once Defendant was no longer living with L.P.'s family, she talked about it "a little bit" with her cousin and her mother. However, L.P. did not want to talk about the abuse with anyone and "just kind of brushed it off."

L.P. did not see Defendant during Thanksgiving. During Christmas, Defendant gave one of L.P.'s neighbors a gift to deliver to L.P. The gift was perfume and a pajama set. L.P. was confused, but did not want Defendant around her. Later, around January 2010, Defendant returned to L.P.'s house to install a hot water heater. L.P. became upset and locked herself inside her bedroom. She ignored Defendant when he tried to talk to her through the door. For L.P.'s birthday in March, Defendant left her a computer at their house while she was at school. L.P. saw Defendant around their house "probably eight, nine times" between November 2009 and March 2010.

-4-

Eventually, Defendant began asking to spend time with L.P.'s younger sister, which made L.P. very uncomfortable because she did not want him to do anything to her younger sister. L.P. began to feel like she needed someone to talk to about everything that had happened to her, but her mother was busy with work and was not open to communication. At some point after she "lost [her] virginity," L.P. began cutting herself with a razor blade. When L.P. was in ninth grade, on one occasion, she was preparing to hang herself because she did not "want to be here," but her younger sister entered L.P.'s bedroom, so she did not go through with it.

L.P. began collecting any kind of pill she could get. After school on September 13, 2010, when L.P. was fifteen years old, she sat on the floor with "a whole bunch of pills in [her] hand, and [she] thought, 'If I take these pills, I can die.'" Contemplating suicide, L.P. wrote a letter to leave behind. Before she could ingest the pills, her younger sister again entered her room, and L.P. did not go through with it. Instead, L.P. again tried to talk to her mother when she returned home from work that evening, but her mother said that they could talk after she slept. Dejected, L.P. left the house and walked down the street. She called 9-1-1 and expressed suicidal and homicidal thoughts.

Officer Chris Davenport of the Memphis Police Department was a member of the Crisis Intervention Team ("CIT"), which is a voluntary unit of police officers that have received specialized training to assist individuals in crisis because of mental illness. He responded to a location on Heckle Avenue around 7:00 p.m. after patrol officers requested CIT assistance. When he arrived, the other officers on the scene informed him that L.P. had made statements to them expressing her desire to "hurt herself and others." She "seemed mentally distraught" as if suffering from depression. Officer Davenport asked L.P. if she wanted to hurt herself and she responded affirmatively. It appeared to him that she was in "crisis," so he took her into protective custody and drove her to Lakeside. During the trip, L.P. seemed "pretty depressed" and did not say much.

Karen Umfress worked for Lakeside doing assessment and intake. On September 13, 2010, L.P. entered Lakeside with her mother, who consented to L.P. receiving treatment. L.P. told Ms. Umfress that she called the police to report her father for rape and molestation, which occurred from the age of four or five until November 2009. L.P. admitted that she had previously attempted suicide by hanging and that she was currently contemplating suicide by way of pills in her bedroom. L.P. reported having had a panic attack and also admitted that she wanted to kill her father. L.P. explained that she was exhibiting obsessive compulsive behavior such as racing thoughts about what her father had done to her and reported that she "was washing her hands a lot." During the assessment, L.P. appeared "guarded" and was "tearful."

In addition to L.P.'s allegations, Ms. Umfress identified some indicators of depression through her assessment questions. Ms. Umfress did not observe any physical

-5-

signs of self-inflicted wounds. Ultimately, Ms. Umfress made a recommendation to the on-duty psychiatrist that L.P. should be hospitalized because there was an imminent threat of harm to herself or others. L.P.'s medical records from Lakeside were admitted into evidence without objection.

As L.P. remembered the intake interview, she discussed her thoughts and her suicide attempts, and she also revealed that Defendant had touched her. However, she did not report that she had sex with Defendant. Although she eventually told someone about the intercourse, she later "told them that it didn't happen because [she] didn't want anybody to know that [she] lost [her] virginity to [her] dad, so [she] didn't want to tell anybody that. [She]'d rather leave it at him just touching [her] than anything different."

Lieutenant Carl Ray of the Memphis Police Department was assigned to investigate L.P.'s case when he was in the Sex Crimes, Juvenile Abuse Squad. Although the case was assigned to Lieutenant Ray in September 2010, he was unable to speak with L.P. until January 2011. He and a worker from the Department of Children Services interviewed her at her high school. After the interview, he completed a report, and the case was later presented to the grand jury for an indictment.

Detective Tobey Shaw of the Shelby County Sheriff's Office was assigned to the Felony Apprehension Team in August 2011. At that time, his team was attempting to locate Defendant to execute an arrest warrant for rape of a child. Defendant was not at home, so the team proceeded to the elementary school where they believed that Defendant might arrive to pick up his children. One of the officers observed Defendant's jeep at the school and initiated a traffic stop. Defendant fled in his vehicle, and the team pursued him. The State published a video recording from the camera of the lead police car in the chase. Defendant eventually pulled his jeep into the driveway of his residence. Detective Shaw approached the jeep on foot and directed Defendant to exit the vehicle. Defendant did not comply and instead turned his jeep around. The jeep "clipped" Detective Shaw, who then fired a round from his sidearm into the jeep. Defendant was wounded in the left shoulder and apprehended. His eighteen-year-old son, L.P.'s older brother, was a passenger in the vehicle.

Kristine Gable was a nurse practitioner working as the nursing coordinator at the Rape Crisis Center. She was certified as a Sexual Assault Nurse Examiner. Without objection, the trial court certified her as an expert in the field of forensic sexual assault nurse examination. The prosecutor submitted the following hypothetical to Ms. Gable: "In your opinion, would it be appropriate to do a sexual assault exam on somebody who is currently experiencing suicidal and homicidal ideations and reports having been molested, the last incident being ten months prior?" Ms. Gable answered negatively. She explained: "No. Because first of all, their safety is foremost, and if they are having suicidal or homicidal thoughts, they need to be protected and others need to be protected.

Then the second part is that it would be way too long to be able to collect any evidence at all." Ms. Gable testified that the standard timeframe for performing a sexual assault examination is within seventy-two hours of the reported incident. She also explained that a sexual assault examination would not be administered if the reported incident involved only sexual contact on top of clothing "because there would be no physical evidence . . . to be collected from their body."

L.P. visited Defendant in jail two or three times with either her mother or her aunt, and she talked to Defendant once when he called. She explained her feelings about talking to Defendant:

> Like I was happy to hear from him and that he's doing okay, see has he changed or anything. Like I still love him. Like if he was to die, like I would be so hurt. And at the same time, it's confusing. Like I don't know whether I should hate him or love him, but I can't hate him because he brought me into this world. Without him, . . . it would not be me. So, I love him. I have no hate. I forgave him for everything he did. Like, I mean, I still want to see him, talk to him. . . . I want him to not bring it up, not to say anything about it, like just leave it alone, let it rest. Like, I forgave you. Why you keep bringing it up? You can say you're sorry, that's about it. But other than that, I don't want to hear nothing about it. Just be my father now. . . .

During direct examination, L.P. admitted that she had previously told Defendant's first attorney that the abuse did not happen. She testified that the story she told the defense attorney was "a lie." L.P. explained that, at the time, Defendant's mother was sick and hospitalized, and Defendant wanted to see his mother before she passed away. L.P. "didn't want to live with that" on her conscience—being the reason Defendant "couldn't say his goodbye to his mother." She also just wanted for all of the legal proceedings to be finished so that she did not have to keep thinking about everything that had happened.

During Defendant's case-in-chief, Kathy Kent testified that she was the assistant public defender initially assigned to represent Defendant in this case. In the fall of 2012, four or five months after being assigned, Ms. Kent was informed that L.P. was in the courtroom and wanted to speak to her. They left the courtroom and Ms. Kent introduced herself. L.P. admitted to Ms. Kent that she had previously told other people that Defendant raped her, but she denied that it actually happened. L.P. told Ms. Kent that there had not been a rape or any other sexual misconduct by Defendant. L.P. explained that she had lied to the police about why she was upset because "she was afraid she was going to get punished for staying out too late with her boyfriend and was afraid that her

father would punish her." L.P. denied to Ms. Kent that anyone was pressuring her to recant her allegations.

At the close of the State's proof, it made an election of offenses. For the charges of rape of a child and incest, the State identified the encounter in the empty townhouse at the Highland Pines Apartments when Defendant had penile/vaginal intercourse with L.P. between October and November 2005 when she was ten years old. For the charge of aggravated sexual battery, the State identified the encounter in the Defendant's bedroom in the Kingston Apartments when he placed his mouth on L.P.'s intimate parts when she was six years old. For the charge of sexual battery by an authority figure, the State identified the encounter in L.P.'s bedroom after she was fourteen years old and grounded for having a hickey on her neck, when Defendant rubbed her breasts and between her legs. Defendant made a motion for judgment of acquittal, which the trial court denied.

Defendant did not testify. In his defense, he called his son, L.P.'s older brother. L.P.'s older brother testified that he remembered his mother and father getting into an argument in November 2009 and that Defendant stopped living with his family on Heckle Avenue and moved in with his girlfriend. L.P.'s older brother did not know the reason for the argument and Defendant's move; neither of his parents spoke with him about it. However, after Defendant moved out of their home, L.P. and her brothers would visit Defendant occasionally.

L.P.'s older brother acknowledged that he was in the jeep with Defendant in 2011 when Defendant was arrested. They were waiting to pick up the rest of his siblings from school. Two police cars drove by, so Defendant left, but the two squad cars began pursuing them. Defendant drove to the place where he was living at the time, and he was shot by a police officer. Defendant said that he had an outstanding warrant, but L.P.'s older brother did not know why he was running.

L.P.'s older brother said that he and L.P. had an "average" relationship and that she communicated normally with others. He described her as "moody" in that she would "go from happy to sad, sad to laughing, laughing to crying" in a kind of "wish-washy" manner. L.P.'s older brother denied witnessing inappropriate conduct between Defendant and L.P. or having any reason to suspect that they were involved in a sexual relationship. L.P.'s older brother specifically denied "walk[ing] into a room one day and [seeing his] father and [his] sister having a sexual encounter" at the Kingston Apartments. L.P.'s older brother said that L.P.'s testimony to that effect was "a lie" because he was "pretty sure" that he "would remember something like that if it did happen, if it did occur."

L.P.'s older brother denied knowing anything about sexual activity between Defendant and L.P., Defendant's charges in this case, or L.P.'s stay at Lakeside until two

days before his testimony when approached by the prosecutor. When asked about a meeting with prosecutors regarding this case, L.P.'s older brother testified that he felt that the prosecutors were pressuring him to testify simply that he did not remember walking in on Defendant and L.P., rather than definitively testifying that the incident did not happen.

As a rebuttal witness for the State, Assistant District Attorney Josh Corman testified that he was present during a meeting between Prosecutor Shelton and L.P.'s older brother, which occurred on the Monday of the week of the trial. In response to questions about whether something happened between Defendant and L.P., L.P.'s older brother insisted that he could not remember if anything happened. During that meeting, no one pressured L.P.'s older brother to tell anything other than the truth.

Over Defendant's objection, R.H., L.P.'s cousin, who is now twenty-two years old, testified as a rebuttal witness. She said that she lived close to L.P.'s family on Heckle Avenue. On a night in November 2009, L.P. "ran" to R.H.'s house. The girls talked alone, and L.P. was crying. L.P. said, "I can't take this anymore. I'm tired of my father." She revealed to R.H. that Defendant had been touching her inappropriately. When R.H.'s mother, who was L.P.'s aunt, returned home, she told L.P. that she could stay at their house as long as she wanted. L.P. spent the night with them.

After deliberation, the jury convicted Defendant as charged. The trial court sentenced Defendant to twenty-five years for rape of a child, a class A felony; twelve years for aggravated sexual battery, a class B felony; six years for sexual battery by an authority figure, a class C felony; and six years for incest, a class C felony. The trial court ordered that Defendant's sentences were to run consecutively, for an effective sentence of forty-nine years. The trial court denied Defendant's motion for new trial, and he timely filed a notice of appeal.

## II. Analysis

Defendant raises the following issues on appeal: (1) whether the trial court erred in determining that the State did not violate Tennessee Rule of Criminal Procedure 16 with late-disclosed discovery; (2) whether the trial court erred by admitting a prior consistent statement of the victim; (3) whether the trial court erred by admitting evidence of Defendant's arrest and giving a jury instruction on flight; (4) whether cumulative error requires reversal of the convictions; (5) whether there is sufficient evidence to support the convictions; and (6) whether Defendant's sentence is excessive.

### A. Discovery Violation

Defendant argues that the trial court erred in permitting the State to call R.H. as a rebuttal witness. Defendant maintains that the State's failure to disclose the identity of R.H. as a potential witness violated Tennessee Rule of Criminal Procedure 16 and the rule of *Brady v. Maryland*, 373 U.S. 83 (1963). The State responds that Defendant has waived this issue because it was not presented to the trial court in his motion for new trial and that Defendant is not entitled to plain error relief.

We agree with the State. Defendant did not raise this issue in his motion for new trial; therefore, it is waived. Tenn. R. App. P. 3(e) (providing "that in all cases tried by a jury, no issue presented for review shall be predicated upon error . . . or other action committed or occurring during the trial of the case . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"). Nonetheless, we may still grant relief under plain error review if the following requirements are satisfied:

> (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

Prior to opening arguments, the State informed the trial court that it had just given notice to defense counsel that R.H. was a potential witness for the State. The prosecutor explained that R.H. might testify because R.H. was someone who the victim told about being sexually abused by Defendant, which could be admissible as a prior consistent statement if the victim was impeached. The prosecutor also explained that R.H. might testify because the victim identified R.H. as someone whom Defendant allegedly attempted to rape on two previous occasions. According to the State, it had only recognized the full value of R.H. as a witness shortly before the trial. Defense counsel objected to the disclosure as untimely and as being so prejudicial that the defense strategy might have to be altered. Defense counsel said that through discovery she was aware of R.H. as a potential witness for the purpose of providing testimony about a prior consistent statement and was prepared for testimony of that nature. However, defense counsel had received no indication that R.H. might also testify that Defendant had previously sexually assaulted her as well.

After hearing of this situation, the trial court seemed seriously concerned about the prejudicial impact of the late disclosure of potential evidence of previous misconduct which would be subject to Rule 404(b) of the Rules of Evidence. Accordingly, the trial court unequivocally told defense counsel that it would grant a continuance if requested. Defense counsel took almost twenty minutes to confer with Defendant about the issue which was followed by a recess for lunch which lasted over an hour. After lunch, defense counsel informed the trial court that Defendant wanted to proceed with the trial, and Defendant testified affirmatively to this effect under oath after being questioned extensively by defense counsel and the trial court. The trial court concluded that Defendant made an intelligent and voluntary waiver of his opportunity to continue the trial.

In his brief, Defendant neither specifies which provision of Tennessee Rule of Criminal Procedure 16 the State violated in this case nor explains how the State allegedly committed a discovery violation under our Rules of Criminal Procedure. We do not believe that Defendant's mention of Rule 16 is self-explanatory. Therefore, we cannot conclude that a clear and unequivocal rule of law was breached on this basis.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. We fail to see, and Defendant does not elucidate, how R.H.'s identity or knowledge of events relevant to this case could be construed as exculpatory or favorable evidence to Defendant. As such, there can be no *Brady* violation and no breach of a clear and unequivocal rule of law.

Moreover, R.H. never gave any testimony at trial about Defendant's previous sexual misconduct, so the most potentially prejudicial portion of her testimony never materialized before the jury. Defense counsel admitted that she was prepared for the testimony that was ultimately given. Therefore, even if we assumed without deciding that there was a discovery violation, it does not plainly appear to us that Defendant did not waive the issue for tactical reasons or that any remedy is needed to do substantial justice, under the circumstances of this case. Defendant is not entitled to relief.

### B. Prior Consistent Statement

Defendant argues that the trial court erred in permitting the victim to testify about the contents of a "self-journal" on depression and anxiety that the victim composed as part of her treatment at Lakeside. Specifically, Defendant contends that the victim's credibility was not sufficiently attacked during cross-examination to permit rehabilitation through the prior consistent statements in the self-journal. The State argues that this issue is waived because there was neither a contemporaneous objection at trial nor mention of

this issue in the motion for new trial. The State also maintains that admission of this evidence was not error.

During cross-examination of the victim, the following exchange transpired:

Defense counsel:    So when you went to Lakeside, you showed distress, right?

Witness:    Yes.

                . . . .

Defense counsel:    So you had a chance to explain why you were there?

Witness:    Yeah.

Defense counsel:    Did you actually open up at that point?

Witness:    I opened up a little, yeah.

Defense counsel:    [Y]ou told them the truth at that point, didn't you?

Witness:    Uh-huh (affirmative response).

Defense counsel:    The whole truth? The whole thing?

Witness:    I don't think it was the whole truth.

Defense counsel:    So nobody knows the whole truth up to today?

                . . . .

Witness:    Yes.

After questioning on other subjects, the cross-examination returned to the topic of the victim's statements at Lakeside.

Defense counsel:    Now, when [the prosecutor], I think she's the one who asked you the question yesterday. She asked you, "When you went to Lakeside, did you tell the truth?" Okay? And you said, you think you did.

-12-

Witness: Uh-huh (affirmative response).

Defense counsel: That's what you said?

Witness: Yes.

Defense counsel: "I think I did." What do you mean by, "I think I did"? How many truth is [sic] there, [L.P.]?

Witness: There is only one truth.

Defense counsel: There is only one truth. But you don't tell the same truth to all the people you talked to, is that right?

Witness: I don't tell them the full truth. I don't tell them that he penetrated. I tell them that he molested me and that he touched me. I don't tell them that he penetrated. That's not something I want to tell everybody. "Oh, you want to know my start? Oh, my daddy molested me. Then I lost my virginity to him." It's not something you want to tell everybody. It's not something that you just want to throw in the air and let everybody know.

Defense counsel: Okay. But I'm talking about there is one truth.

Witness: Yeah. I'm telling the truth now.

Defense counsel: There is the truth, and there is a lie.

Witness: Uh-huh (affirmative response).

Defense counsel: Okay? And anything that is not the truth is a lie. Do you agree with me?

Witness: Yeah.

Defense counsel: So when you say you don't tell the whole truth, there is only one truth.

Witness: That doesn't mean it's a lie. That means it's—I'm giving part of the story.

-13-

Defense counsel: So you omitted. It's not you're lying, but you don't tell everything. Therefore, there is an omission. Is that what you consider not the whole truth, is when you omit to say something, when you do not say everything?

Witness: Uh-huh (affirmative response).

Defense counsel: Is that a lie for you or is that an omission?

Witness: It's not a lie. I told part of—it's not a lie because I told the truth.

Defense counsel: So you think you told the whole truth to Lakeside, or you think you may have said some—left some things out?

Witness: I left one thing out.

Defense counsel: You left one thing out—

Witness: Uh-huh (affirmative response).

Defense counsel: —when you talked to Lakeside?

Witness: Yeah.

Defense counsel: That you've never shared with anybody?

Witness: Yes.

During redirect examination, the victim identified the self-journal and gave a general explanation of the purpose of the assignment. The victim said that Lakeside collected the self-journal and that she discussed the contents during her group therapy sessions. The victim testified that what she wrote in the self-journal was "the truth." The prosecutor then proceeded to read verbatim entries from the self-journal and asked whether the victim made each specific entry; the victim consistently responded affirmatively. The self-journal was not admitted into evidence until later in the trial through a different witness.

-14-

During the span of this examination, the trial court overruled an objection for lack of foundation and sustained an objection to the witness reading the contents of the self-journal. Defendant did not specifically object to the prosecutor's questioning from the self-journal entries. Whether Defendant made an adequate contemporaneous objection to questioning about the self-journal is immaterial to our analysis because Defendant did not raise this issue in his motion for new trial. Thus, our review is limited to plain error. *See* Tenn. R. App. P. 3(e), 36(b).

Unlike its federal counterpart, the Tennessee Rules of Evidence do not contain a hearsay exception for prior consistent statements. *State v. Herron*, 461 S.W.3d 890, 904 & n.12 (Tenn. 2015). As a general rule, prior consistent statements may not be introduced at trial to bolster the testimony of a witness, *id.* at 904-05, or to rehabilitate the credibility of a witness, *State v. Boyd*, 797 S.W.2d 589, 593 (Tenn. 1990); *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980). The purpose of this rule is to avoid the "danger of 'the jury being influenced to decide the case on the repetitive nature of or the contents of the out-of-court statements instead of on the in-court, under-oath testimony.'" *Herron*, 461 S.W.3d at 905 (quoting *State v. Tizard*, 897 S.W.2d 732, 747 (Tenn. Crim. App. 1994)).

However, our case law has recognized three exceptions to the general rule:

> First, a "prior consistent statement may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made or when deliberate falsehood has been implied." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). In such a situation, a prior consistent statement is allowed to show that the trial testimony is consistent with what the witness said when no influence or motive to lie existed. *State v. Sutton*, [] 291 S.W. 1069, 1070 ([Tenn.] 1927). Second, a prior consistent statement may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness's testimony was either fabricated or based upon faulty recollection. *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). Moreover, "the impeaching attack which allows for corroboration may occur during cross-examination of the witness. . . . Under such circumstances, the [witness's] statement made before the inconsistent statement but which was consistent with his trial testimony" is admissible to rehabilitate the witness. *Id.* (citations omitted). Third, a prior inconsistent statement may be admissible when a witness's prior statement is used out of context to cross-examine the witness. *State v. Boyd*, 797 S.W.2d 589, 593-94 (Tenn. 1990).

*State v. Charles Sherman Thaxton*, No. E1999-02091-CCA-R3-CD, 2000 WL 1499440, at *3 (Tenn. Crim. App. Oct. 10, 2000) (last alteration in original), *no perm. app. filed*.

-15-

Defendant argues that the first exception was not applicable in this case because he never made an insinuation of recent fabrication or deliberate falsehood. We agree. During cross-examination, defense counsel suggested that the victim fabricated the allegations because she was mad about being prevented from seeing her boyfriend and wanted attention from her mother. However, those motives existed from the outset and were not recent developments prior to the victim's trial testimony. *See Charles Sherman Thaxton*, 2000 WL 1499440, at *4 (finding first exception inapplicable where "[t]he defendant attacked the victim's testimony by suggesting that the allegation was a lie from the beginning").

However, we conclude that portions of the self-journal were admissible under the third exception. In *Boyd*, our supreme court explained:

> The State was allowed to place in proper context supposedly inconsistent statements brought into evidence by defendant. Where specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness and there is no error in allowing the statements to be placed in context.

797 S.W.2d at 594 (citing *Cole v. State*, 498 S.W.2d 915, 917 (Tenn. Crim. App. 1973)).

In this case, defense counsel extensively cross-examined the victim about being less than completely truthful and making allegedly inconsistent statements during her treatment at Lakeside. On redirect, the State introduced specific statements made by the victim at Lakeside in her self-journal.

Prosecutor: And did you say or write, "OK. It started around four or five years of age when my father sexually assaulted me. As I got old, he sexually abused me. In other words, raped. From that, I felt depressed, suicidal and I wanted to kill myself as well as him"?

Witness: Yes.

Prosecutor: Is that what you wrote in here?

Witness: Yes.

Prosecutor: And is that the truth?

Witness:      Yes.

. . . .

Prosecutor:   So in this Lakeside statement, . . . you did say that your father sexually assaulted you?

. . . .

Witness:      Yes.

Prosecutor:   Okay.  And that's what you're saying today?

Witness:      Yes.

Prosecutor:   Also, and I'm not going to read through this whole thing, but number 20, it says, "Write about a time that you remember hurting someone."  Did you write, "When I got raped, he hurt me, because your dad is someone that's supposed to love you and care for you"?

Witness:      Yes.

Prosecutor:   And is that what you wrote in your journal at Lakeside?

Witness:      Yes.

Prosecutor:   And is that the truth?

Witness:      Yes.

Because Defendant impeached the victim with allegedly inconsistent statements about what her father did to her, which were made during her stay at Lakeside, the State was entitled to introduce those statements to show that they were actually consistent, rather than inconsistent, with the victim's trial testimony.

Without recounting them in this opinion, we note that there are a few instances when the prosecutor asked the victim about entries in the self-journal which related to her feelings about what happened to her and why she was troubled.  Those statements lean more toward improper bolstering to rebut the cross-examination on the victim's motive to fabricate the allegations, which would violate the general rule against using prior consistent statements to rebut impeachment.  However, we are convinced that any error

in the introduction of those statements was harmless and did not rise to the level of plain error.

## C. Flight

Defendant argues that the trial court erred by permitting the State to introduce into evidence the video recording of Defendant's fleeing in his jeep from the police officers who were attempting to arrest him. Defendant maintains that this evidence was improper because the officers were executing an arrest warrant for a different case. The State argues there was no error.

"[F]light and attempts to evade arrest are relevant as circumstances from which, when considered with other facts and circumstances in evidence, a jury can properly draw an inference of guilt." *State v. Dorantes*, 331 S.W.3d 370, 388 (Tenn. 2011) (quoting *State v. Zagorski*, 701 S.W.2d 808, 813 (Tenn. 1985)). In this case, Defendant led officers on a car chase and assaulted an officer with his vehicle before he was shot and arrested. From the arguments of counsel to the trial court it appears that there were multiple outstanding warrants for Defendant's arrest at the time he was apprehended. It's unclear which warrants were being executed and whether Defendant was aware of any of them. Nonetheless, admission of his flight and evasion was not an abuse of discretion in this case. *See State v. Berry*, 141 S.W.3d 549, 589 (Tenn. 2004) ("A flight instruction is not prohibited when there are multiple motives for flight because to determine otherwise would prevent a flight instruction when a defendant evades arrest for numerous crimes."). Defendant is not entitled to relief on this issue.

## D. Cumulative Error

Defendant argues that the cumulative effect of the errors committed during the trial warrants a new trial. However, because the trial court did not make multiple, if any, errors, Defendant is not entitled to relief on this basis. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

## F. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a

verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant . . ., if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). Aggravated sexual battery is unlawful sexual contact with a victim less than thirteen years of age. T.C.A. § 39-13-504(a), (4). Sexual battery by an authority figure is unlawful sexual contact with a victim between thirteen and eighteen years of age when the defendant had parental authority over the victim and used the authority to accomplish the sexual contact. T.C.A. § 39-13-527(a)(1), (a)(3)(B). Incest is sexual penetration of one's child. T.C.A. § 39-15-302(a)(1).

Defendant concedes that the evidence is sufficient to support his convictions, and we concur. The victim provided detailed testimony about all three of the offenses for which the State elected to prosecute. Her account of what transpired proves all elements of each offense. It was within the jury's province to accredit her testimony and convict Defendant upon that proof. *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction." (internal quotation omitted)). Defendant is not entitled to relief on this basis.

E. Excessive Sentence

Defendant makes a conclusory assertion that his sentence is excessive without supporting argument. The State argues that this issue is waived and that the sentence is not excessive. We agree with the State.

Defendant was sentenced to the following consecutive sentences: twenty-five years for rape of a child, a class A felony; twelve years for aggravated sexual battery, a class B felony; six years for sexual battery by an authority figure, a class C felony; and six years for incest, a class C felony.

Defendant has waived this issue by not explaining how or why his aggregate sentence or individual sentences are excessive. Tenn. Ct. Crim. App. R. 10(b). Nonetheless, we note that each sentence is within the applicable range, and the trial court made relevant findings on the record for the length of the sentences and for consecutive service. In our view, Defendant's sentence comports with the purposes and principles of our sentencing act, and he is not entitled to relief.

In his reply brief, Defendant makes new assertions that "the multiple convictions and consecutive sentencing herein violated the principles of double jeopardy and that the doctrine of merger should apply to his convictions." However, Defendant does not specify which convictions he believes should be merged and does not explain how consecutive sentencing violates the purposes and principles of the sentencing act. These issues are also waived because they were raised for the first time in a reply brief, *State v. Walter Francis Fitzpatrick, III*, No. E2014-01864-CCA-R3-CD, 2015 WL 5242915, at *8 (Tenn. Crim. App. Sept. 8, 2015) (citing additional authority), *perm. app. filed* (Tenn. Nov. 11, 2015), and as stated above, we do not find plain error in the trial court's order of consecutive sentencing. Likewise, we do not find plain error in the trial court's failure to merge any of the convictions because the convictions for rape of a child, aggravated sexual battery, and sexual battery by an authority figure were for three separate instances of criminal conduct and because the convictions for rape of a child and incest do not violate double jeopardy protections. *See State v. David Eugene Breeze*, No. W2011-01231-CCA-R3-CD, 2012 WL 6728345, at *8 (Tenn. Crim. App. Dec. 28, 2012) (reversing merger of convictions for rape and incest on the rationale that separate convictions for those offenses do not violate the *Blockburger* test as adopted in *State v. Watkins*, 362 S.W.3d 532 (Tenn. 2012), because each offense requires proof of an element that the other does not), *perm. app. denied* (Tenn. May 14, 2013).

*IV.  Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE